Mr. Wolfman, I think you're batting lead off today, right? Thank you, Your Honor. May it please the Court. Dr. Harrison alleges she was denied job-related training benefits that white and male employees received. Title VII prohibits intentional differential treatment, a term, condition, or privilege in employment. A term, condition, or privilege of employment, in turn, is a workplace requirement or benefit that an employer imposes on, grants to, or withholds from an employee. So a discriminatory refusal to pay for an employee's training violates Title VII because job training is a job benefit. A privilege of employment that, as the Supreme Court said in the Hishon case, an employer may not dole out on a discriminatory basis, even if it's free not to provide that benefit at all. To what degree does your argument rely solely on the fact that Harrison incurred monetary harm? Thank you, Your Honor. That is one way, that is one channel for us to prevail under a case like Fierro's, as we point out in our brief. It's not the only basis for us to prevail, but it would be sufficient to obtain a reversal and remand. She has sustained economic loss, and this Court could narrowly rule in her favor on that basis. And to be clear, there's no, correct me if I'm wrong, breach of contract or detrimental reliance. This is a straight-up discrimination case. That is correct. There are no state law claims. So I want to move past the point you're making, Judge Engelhardt, on the economic loss. That was to be my second point. And turn to this Court's precedent, which I think is consistent with the definition I just gave you of what a term condition and privilege is. And that's this Court's decision in Shackleford v. Deloitte & Touche. It holds non-actionable, to be sure, only peripheral denials of training that don't tend to result in a change of, and I'm quoting here, employment status, benefits, or responsibilities. So Shackleford and the cases that sort of followed in the wake of Shackleford, in your view, do they sort of tee up or articulate a special kind of ad hoc standard for denials of training? Or if so, how are those different than garden variety standards and sort of normal standards in Title VII cases? I think my answer to your question is yes, in this sense, that it articulates a standard, and you see this in the lateral transfer cases as well, that for what one might call an ordinary or day-to-day failure to train, that under this Court's precedents, they're not actionable. So what you're looking for in a case like Shackleford is a plus factor of some sort. In other words, is this training that's reasonably objectively tethered to what might be a change of employment status, benefits, or responsibilities? Again, quoting from Shackleford. And the whole point of the training here, the superintendent training at issue here, the Leadership Academy superintendent training sponsored by the Mississippi School Boards Association, is to, and now I'm quoting again, to tend to result in a change of employment status, benefits, or responsibility. Is there any evidence that it does that? I mean, is there any objective evidence? I realize it's a credentialing thing, but it's completely outside the school district and it's completely optional to do it, correct? That is correct, and we're on the pleadings here, but I think you have to go no further than the district court's opinion. The district court put it this way, this is at the Record Excerpts 10, the Academy is a year-long program designed to prepare an attendee to become a superintendent, which is the highest position within a school district. So it's not a guarantee, I agree with you, Judge Wilson, but if you're looking for that tether, the kind of thing that Shackleford is looking for, that plus factor, that's how I read Shackleford, I think it's the fairest way to read it, then this is squarely within that plus factor analysis. One way to think about it is... Plus factor, I think I understand what you mean by that, but assuming that we find that the ultimate employment decision test that's set forth in a lot of the circuit cases still applies, how do we distinguish, let's say, a case like Dulles? I think that in Dulles, there was a denial of attendance to go to a training conference, to be sure. And what I would say is that that fits more into the ordinary training, the day-to-day training, the continuing legal education that lawyers go to, not something that is tethered objectively, as opposed to subjectively, this is in your case law, to a realistic future opportunity. But how do you quantify that? It is very difficult. Well, it is because it's not really tethered to anything other than the hopes and aspirations. That is correct. But I'll put it this way, Judge Wilson, if one doesn't have to make that differentiation between objective-subjective, reasonable tethering or not, then Shackleford and its progeny would simply say any training case is non-actionable, and that is not what Shackleford is saying. Now, I don't want to hide the ball here. Our briefs think that in an appropriate case, this Court should rethink the entire ultimate employment decision doctrine. Can this panel do that? I think it probably cannot. But it can do what the Court did, I think, in the Threed case in the Sixth Circuit. It can begin to move the ball a little bit by saying, look, there's a lot of wiggle room in this doctrine, and we can say that if, to the extent that there is a plus factor, what we should be looking for, we should take a look at this ultimate employment decision doctrine and begin to think of it as simply a surrogate for the operative words of the statute. And that's what Judge Sutton said in Threed. I don't think the Court needs to do that here, and it's obviously up to this panel as to whether to do that. I think here there are two potential channels for a reversal. We began speaking with Judge Engelhardt about the economic harm channel, and then there's this other channel, the training plus factor. But economic harm, she decided to go do this after she was told she wouldn't be reimbursed. That is correct. Totally optional. That is correct, but... So the economic harm was self-inflicted. I think not in this sense, Judge Wilson. And we addressed this in our reply brief, which is that... Your briefing talked about, like, this being a reduction in compensation by $2,000, but I just... I'm not sure I follow that. I mean, she would have lost nothing in terms of compensation had she not known. That's right. If she had simply not gone to the training, then we would just be in this shackle-firm realm. But because she went to the training, I don't think it's appropriate to hold that against her because it assumes the very thing that... assumes a conclusion about the very thing at issue here, which is that she's being treated differently than white and male employees who are having their training paid for. So at the end of the day, if she engages in the same conduct as the white and male employees, she's short $2,000. That's the estimate that the district court put on the training. So that's why we think there is a separate channel to a remand here for development of the record. You press another theory in your brief about how the district's refusal to pay for this training could be seen as a denial of a benefit, denial of compensation. But can you kind of steer me? Can you identify a case, not just from our circuit, but anywhere in the country, where a denial of training was held actionable under Title VII, under that benefit or compensation theory? Well, yes. Not a decision of this court, but I think more on the Shackleford line of authority as opposed to the Fierro's compensation line of authority. But if you take a case like Darby v. Calumet Packaging, which is a case from the Western District of Louisiana, 2018 Westlaw 511-7027, Durkin v. Henderson, 2001 Westlaw 125-4865. In those cases, what the court was saying is that there was an objectively reasonable way of viewing the type of training that was issued, that it was reasonably tethered to job advancement, and that's what we have here. In those cases, you're saying, hold that it is actionable under Title VII, but denial of training is actionable as a benefit or as compensation? As training. No court has embraced the compensation theory, except that, of course, there are plenty of compensation-oriented cases, but no court, as far as I'm aware, have accepted it in the training realm because this is an unusual fact pattern. Here, she went and she suffered economic loss compared to the white and male employees. No question that she incurred the expense, but she's been treated differentially, and that's unlawful under Title VII. I want to point out that the two cases I cited to you, Judge Willett, one of them, Darby, actually specifically distinguishes Shackelford and says that, well, this training was training that was tethered to greater job responsibility and potential future compensation. And, of course, that's what we're saying about principal training as well. If the court has nothing further, I'll reserve the balance of my time. Okay. Mr. Wolfman, thank you. I think we're next going to hear from Ms. Baldwin from the Justice Department as amicus, or amicus, as we say in Texas. Welcome. Thank you, Your Honor. Anna Baldwin for the United States. May it please the Court. The question, as the Court's been discussing with counsel, is whether in this appeal, which is, again, on a motion for judgment, so taking the facts and the complaint as true and viewing the inferences in favor of the non-moving party, the question is whether the statute freely permits employers to pay for a training for white and male employees to attend, but based on race and gender, would permit that employer to say, I'm not going to permit, I'm not going to reimburse a black female employee to receive the same training. So when the district court granted the district's motion, it's effectively holding that, if you're just looking at the adverse employment action, and because the court is saying you haven't pled an adverse employment action, a district could literally have a policy that says we will only pay to train white male employees and we will not pay to train African-American female employees, and that can't be the law. That can't be what Title VII permits when it bars discrimination and the terms, conditions, and privileges of employment. As the panel was talking with counsel, there's sort of two routes to get there. First, you have in the plain statutory text, as well as in this court's ultimate employment decision case law, it's clear that discrimination based on compensation is illegal, but I think what happened here in the district court below is you have, as sort of Judge Sutton discusses in the Threat Decision, you have a game of telephone gone wrong, where you just first start with, is this an ultimate employment decision? This is about denial of training. Ultimate employment decisions are hiring, firing, demotion, promotion. Training isn't one of those, so this can't fall within it. So the district court never grapples with the fact that this is a monetary decision, that you are having an impact that could clearly be regarded as compensation under the plain terms of the statute, as well as under the ultimate employment decision test. And then the court also doesn't grapple with the fact that this could be a privilege of employment. Again, you know, there's no difference under the text of the statute of whether you have a direct evidence case or a circumstantial evidence case. So a question that I think is helpful for the court to ask is, if you literally had an employer having a policy that says literally only employees of one race can attend this training, it can't be that that doesn't create, you know, liability, potential liability, an actionable claim under the statute. And so here, again, you know, separating out, we're taking, we're on a motion for judgment. Assuming these allegations are true, the sole legal basis was the idea that this didn't state an actionable claim. And so under, you know, the text of Section 703 bans discrimination in the terms, conditions, privileges, and compensation. That's meant to be read expansively. Counsel, let me interrupt you, though. Plaintiff's counsel said our panel is likely bound by our circuit's precedent, which hinges on that ultimate employment decision test. Does plaintiff win under that test? I mean, I get your argument about the text of the statute, somewhat sympathetic to it, but we operate within precedent of the circuit. Absolutely, and I would agree with plaintiff's counsel that the Threatt decision is somewhat of a model for the panel to reorient. What was at issue in Threatt? I mean, I've read it, I can't recall. Sure, it was a shift assignment. So you had an explicit race-based policy that said that you could never have black sergeants supervising other black sergeants. You always had to have a white sergeant running the shifts. And so it was just about the win of employment. And, you know, Judge Sutton... But there, that did impact the job that they currently held, and it involved shift assignments. It involved... I think it disregarded seniority. It comes back to me a little bit now. So they disregarded what had been the basis for choosing shift selection, I guess, and they instead went with this other policy, you know? And so that impacted the job they had right then and right now. And so it was plaintiff's desire for some potential job in the future and this optional training that really had nothing to do with what she did at the school district, right? Well, Your Honor, I would just... Isn't that a distinction? That's one distinction, and it's a distinction based on what this Court's case law does sometimes draw about that the harm isn't just the harm of the discrimination itself, that there has to be some further downstream consequence of discrimination, that it significantly changes your current employment. But again, just pivoting to the example of... You have a direct evidence case where you literally have still the same facts, and really the facts that are alleged in this complaint, where Dr. Harrison alleges that all other employees who've been accepted into this specific training have been reimbursed, but she... I thought she said there were three other employees. Does she say all, everybody else, or does she say there were three others that got paid? I believe, Your Honor, there's one paragraph in her complaint that says all, and then she, in another paragraph, says three. But again, viewing the facts most favorably, you have... She's saying that this is a practice that the district has, and it didn't apply to her. So if you... Again, if you have a direct evidence case where you say, we're going to train white employees but not black employees, that surely is impacting your current employment right now. The discrimination is the injury that makes the claim actionable. You have an Article III injury, which is what III talks about. You don't have to show economic harm. There are lots of Supreme Court cases that have said, you know, Title VII is not limited to just economic harms. It's the harm of discrimination, the harm of being treated differently. And so if there's a way in which, you know, obviously we agree, you know, this court now is acting as a panel, but there is a way to say this case does involve compensation and to look at the plain statutory text and to reach a result that's consistent with both. Thank you, Your Honor. Thank you very much. All right, we're going to shift over to the school district. Ms. Desmond. Thank you, Your Honor. I think you'll go first. Go ahead. Good afternoon. It's undisputed in this case that Title VII prohibits discrimination in the terms and conditions of employment. This does involve the compensation, terms, conditions, or privileges of employment. But the Fifth Circuit has held multiple times that it strictly construes what the meaning of an adverse employment action to include only ultimate employment decisions, such as hiring, granting, leave, discharging, promoting, or compensation. And I believe the earliest case to do that was the McCoy v. City of Shreveport case that's been cited in the briefs here. Counsel, what was the school district's policy for reimbursing people to go on this training? They did not have a policy. All right, so plaintiff alleges that there were three, or all, the other people who went to this in the past, three white males who got reimbursed for going. How were they chosen? Well, this is not actually in the pleadings. They were chosen because there was a difference in changing the state law. State law actually changed in the interim where individuals could only go to the academy, they could be chosen in the academy, but they could not be hired as a superintendent when they had certain grades in their schools. And Dr. Harrison's school grades were lower, so she would not have been eligible. The school rankings? Yes, when she was principal. So she would not have been eligible to become a superintendent, even with graduating from the academy. Tell me a little bit, if you could, about why it was she was told by the superintendent and assistant superintendent that, hey, if you get selected for this, we'll reimburse you, and then we say, nope, sorry, we're not. Because of the change in the law, state law. Was that communicated to her? Yes, and it was communicated to the EEOC as well. To the? The EEOC during our investigation at the EEOC level. You began by citing the sort of ultimate employment... Correct. ...decision standard. Counsel opposite, they cite a whole host of Supreme Court decisions that seem to reject such a standard. And I just wondered if you could direct us, if you could identify one of our cases, maybe, that attempts to reconcile this ultimate employment decision requirement with any of those Supreme Court cases. Well, actually, you just look in the context of the Supreme Court case, and then I'll also give some of the Fifth Circuit cases since then. The Supreme Court specifically stated in the Burlington case that the retaliation provision went beyond the terms and conditions of employment, that ultimate thing that the Fifth Circuit had earlier imposed in the retaliation stage. But it also stated that discrimination claims were still limited to the terms and conditions of employment. So that's actually in the Burlington case. And if you look at this court, since Burlington was decided, the Peterson v. Langer controls case said that, even post-Burlington, we still look at the terms and conditions of employment. And Judge Englehart, when you were on the district court, you actually put in a footnote that even post-Burlington, we still look at the terms and conditions of employment, and that was the Baker v. FedEx ground package systems case. And so, I mean, the Supreme Court itself says we're still looking at the terms and conditions of employment. And that's important here because you do have to recognize in the context of Dr. Harrison. She was the school district's director of alternative services. There was no requirement of her current job to attend superintendent school. It's something that she aspired to be as a superintendent. And what's really interesting, there's no allegation there was any open position that she would have been eligible for. She attended the superintendent school, and there's no allegation she even got the position, got a superintendent position after she attended it. And so I think that is very important here. But there was not even any prerequisite to attend the Charney Academy to become a superintendent. Counsel, as a follow-up to what Judge Willett just asked, do you concede that notwithstanding this circuit's precedent, the plain language of Title VII might be broad enough to go ahead and encompass the claims that are made here? No, I don't, Your Honor. And this is not a Fifth Circuit case, but I will point out a Seventh Circuit case, and it's the Washington v. Illinois Department of Revenue case that I think has been cited in the briefs. And it was a Seventh Circuit case, but it talks about the word discrimination. And the word discrimination, according to the Seventh Circuit, reasonably sweeps in some form of an adversity and a materiality threshold. It prevents the undefined word discrimination from commanding judges to supervise the issue of personnel management. And that's what you would have here. Every time someone thinks it's not fair, someone got a little bit of a better treatment than I did, then we would be looking at, this Court, looking at the minutiae of personnel decisions, which is not what this Court needs to be doing. And that is why we do have that materiality threshold. And according to the Seventh Circuit, the reason why we do have that high threshold here is because this is what gets us to Article III injury. And that is what we're bound by under the Constitution. And so that's why the threshold is there. And according to even the Supreme Court, it makes sure that we have an Article III injury and not differential treatment that helps an employee or perhaps is even requested by an employee. And that's from the Supreme Court, the TransUnion LLC case. So I don't concede that. I mean, because if we did have that low of a threshold, literally we would have this Court and district court judges looking at everyday personnel decisions and determining whether there's some type of difference in the treatment. And there's always going to be some type of difference in treatment and employment for various reasons. It doesn't necessarily mean that it's going to be because of some race or gender or protected class. Sometimes there's just difference in treatment from employers. And so that's why we do have a certain level. And I did want to address the compensation issue here because they're saying it affected her compensation. She was still being paid the same as a director of alternative services. No one asked her to pay this $2,000 to attend the academy that she was doing of her own free will, that she voluntarily did. And I will also point out in the complaint itself, it talks about the denial of this training. It allowed her not to be able to be promoted to a higher position. But again, there's no allegation that even after she attended the training and paid for herself, that she ever became a superintendent. Even if we sort of reaffirm, I suppose, that ultimate employment decision remains the controlling standard, then I guess we have to confront this decision whether the refusal to pay for her to attend the academy qualifies as such a decision. And frankly, our Dallas case suggests that it does not. Our Thompson case suggests that it does. So help us untangle that. I think one of the distinctions here is that actually involved their current job. When you talked about the training and failure to reimburse, that actually involved the compensation of their current position, because it was training that was being required by the employer, and the employer was not compensating for it. Here is training that was not being required by the employer, did not affect her current job, did not affect her compensation in her current position, and just did not affect the terms and conditions of her current employment. All right. Move on. Next point. Go ahead. I do want to leave time for my co-counsel to address the amicus brief here. But as the Brooks v. Firestone case is in the brief, also says that a failure to train cannot constitute an ultimate employment decision or adverse employment action when there is only some tangential effect on compensation. We don't even have that here in this case. It did not affect her current compensation. It is tangential that it would have ever affected her compensation, assuming that she would have ever gotten a promotion to a superintendent position. All of this is just simply she wants to be more marketable for a future position. She wants to attend training that was not even a prerequisite for the job. And again, here we don't have any evidence or any allegations that it ever affected her ability to become a superintendent. What we have here is her subjective preference, and that simply cannot be an adverse employment action. It was her subjective desire to go to the academy at the precise moment she wanted to do so, and that just cannot be an adverse employment action. Why did the school district tell her, I mean, I think this is right, that, well, you can go in a couple of years and we'll look at reimbursing you? We're hoping that her school grades would improve at that point. All right. I'm going to turn it over to my co-counsel, unless you have any other questions. All right. Thank you, Ms. Gessman. Thank you. All right, Ms. Harrell, you have 10 minutes. Thank you, Your Honor. My name is Caitlin Harrell. I'm Ms. Gessman's co-counsel here to address the arguments made by the United States in their amicus brief, and I'll try not to retread over ground that Ms. Gessman's already covered. Based on the question and answer, I should be able to cut this down a little bit. But as a preliminary matter, the United States admits that the law of the circuit, as it stands, precludes Dr. Harrison from any recovery in this case. While the United States argues in its brief that the court's ultimate employment decision standard is irreconcilable with the text of Section 703A1, and that that should be reconsidered, it admits the existence and applicability of this standard in this circuit. This court in Peterson v. Linear Controls explained that the circuit strictly construes adverse employment actions to include only ultimate employment decisions, such as hiring, granting leave, discharging, promoting, or compensation. Further, the U.S. misrepresents, or excuse me, misunderstands plaintiff's complaint and the assumption that must be drawn from it. The United States argues that under the district court's reasoning, if the school district's files contained a memo stating that it would pay to train men and not women, that Title VII would have nothing to say about it. But the United States fails to recognize that there's no policy here indicating that there's going to be discriminatory conduct. And as Ms. Desmond explained, this is an incident where a single employee was told, not now, when she requested reimbursement for a training that would enable her to be potentially qualified for a job that may come into existence at some point in the future. The result the United States seeks in its brief, upending the precedent of the circuit in favor of a broader definition of adverse employment action is untenable. The United States argues that the district discriminated against Dr. Harrison because of her race and sex with respect to the compensation terms, conditions, or privileges of her employment. The United States wishes to expand the definition of discrimination under Title VII to a more inclusive definition that is more in consistence with the ordinary meaning of the text. But the Supreme Court has emphasized the need for objective standards in Title VII context. In Burlington, this broad definition... In Burlington, the Supreme Court emphasized the need for objective standards in Title VII context. But if we were writing on a clean slate, put aside the precedent in our circuit, why wouldn't we go to the text of the statute? I mean, what you quoted to me as far as what the amicus says it wants to expand coverage is straight from the text. And I understand that, Your Honor, but you still have to have an injury, and I think that's why the Supreme Court has interpreted the text under McDonnell-Douglas standards to require an adverse employment action, and that's why this circuit has interpreted what an adverse employment action means. Well, we've said that it's an ultimate employment decision, but if it was adverse to a benefit, compensation, a privilege of employment, doesn't that fit squarely within the text? It does fit within the text, but I think that you have to look at the text, one, in the context of you have to have an actual injury, and that's why the McDonnell-Douglas standard exists, and two... Isn't it sufficient for her to allege, the plaintiff to allege, there were three white men who went on this seminar, they got reimbursed. I'm a black woman. I didn't get reimbursed. And in fact, they told me I would, and then they told me, no, I won't, or we won't. Well, they told you, no, they won't, after, excuse me, they told her that they would not reimburse her before she made the decision to go, and before... They initially told her they would. They did tell her, at some point, we'll pay for it. And that's consistent with, I mean, and again, you know, we can't get into the facts too much here because we're... But let's just talk about the allegations. Okay. How does that not travel under the statute? There has to be interpretation of the statute. I mean, it can't just be that there's any term privilege or condition of employment, because if that was the standard, then everything would be considered a term privilege or condition of employment. But training surely is, isn't it? Training... I think you have to look at the context of the training. I mean, I think that there's a difference between training for a current position,  and there was a training that they had to go to, and then they had to go to another position, and they needed to continue that position. Then that's a different scenario than what we have here, where there's an individual who just decides that she wants to go out and do a training for some potential future spot that may or may not be open that doesn't have anything to do with her current position. I think that there's a distinction there. And I think it's important that we continue to interpret the terms, conditions, or privileges of employment as ultimate employment, under the ultimate employment standard in this circuit, because anything could really be a term or condition of employment, because everybody's in a protected class, and there's a difference. And for an employer to be able to figure out what that means would be so onerous that an employer would never be able to figure out what the potential impact of their actions were going to be, because that standard just would encompass kind of everything. It would encompass any perceived slight by an employee. For employers to be able to run their businesses, they need clarity in the law, predictability in its enforcement, and reasonable limits on what they're expected to know. The amicus brief cites the Ellerth case, and the United States argues that the district court misread Ellerth, but the district submits that Ellerth provides guidance in the incident case. Because while Ellerth identifies tangible employment actions to discern a class of hostile work environment cases in which an employer should be held vicariously liable, as Ellerth mentions, quid pro quo and hostile work environment do not appear in the statutory text of Title VII. Similarly, adverse employment action doesn't appear in the statute, but the Supreme Court appropriately held that it's a prerequisite for demonstrating Title VII discrimination in McDonnell and Douglas. And this court has defined that phrase as requiring an ultimate employment action in cases such as Peterson v. Linear Controls, Hallman v. Potter. Now, in McCoy v. City of Shreveport, that Ms. Desmond talked about earlier, there's a Fifth Circuit case after the Burlington case that came out in the Supreme Court that explained the distinction between discrimination under Title VII and what, excuse me, what constituted discrimination under Title VII and then discrimination in the retaliation context. And the definition that the United States seeks for an adverse employment action in the Title VII context already exists in this retaliation context, and that's what Burlington said and that's what the Fifth Circuit said whenever it was explaining the holding of McCoy v. City of Shreveport. Now, this circuit should not extend the definition to the Title VII context as it is contrary to the Burlington decision and because there's a logical distinction between somebody who's just a member of a protected class and then someone who's engaging in a protected activity. The Supreme Court sets forth an easily understood rationale for this in Burlington. Burlington explains that Title VII depends on employee cooperation for its enforcement. The Supreme Court did not accept the argument that it's anomalous to read the statute to provide broader protection for retaliation than in Title VII discrimination cases. This necessarily means that the Supreme Court endorses a more narrow protection in the Title VII discrimination context than in the retaliation context. And as the court explained, Title VII substantive and retaliation provisions are not coterminous. Supreme Court explained that it sought to characterize how harmful an act of retaliation discrimination must be in order to fall within the provision scope and explained that Title VII discrimination and retaliation provisions differ in language and purpose. The anti-discrimination provision seeks a workplace where individuals are not discriminated against because of their racial, ethnic, religion, excuse me, religious or gender-based status but the anti-retaliation provision seeks to secure an objective by preventing an employer from interfering with an employee's efforts to secure or advance enforcement of the act's basic guarantees. The substantive provision seeks to prevent an injury to individuals based on who they are. The anti-retaliation provision seeks to prevent harm to individuals based on what they do. There's a difference between being in a protected class and engaging in a protected activity under the law of this court and the law of the United States Supreme Court. The Supreme Court clarified this in Burlington and the court followed that logic in Peterson. Thus, the district submits that this court should not change the law of the circuit by broadening the definition of an adverse employment action in the Title VII. Quick question. The price of attendance for this seminar was 2,000, am I remembering correctly, $2,000? Yes. Assuming, random hypothetical, that in lieu of the school district kind of writing a check to the seminar provider, here's $2,000 to underwrite this person's attendance. Say the person paid for it out of their own pocket. Say they were reimbursed. Say the cost of that attendance was kind of baked into their salary, into their paycheck. You spent $2,000 to attend this seminar. If the reimbursement, if the financing of attendance was handled that way as a function of pay, salary, would that make any difference into whether it's actionable or not? Would it then fall under compensation? Are we just sort of bickering here over the form of how the seminar attendance is paid for? I don't think so. I think there's... Okay, so you're saying you're hypothetical. You're assuming that... Well, had she attended, would the payment have been simply the school district writing a check to the seminar provider for $2,000? You have no idea? It's outside the record as they say? It's outside of the record. I don't know if they would have paid her the $2,000 or the seminar $2,000, but they're not really paying... It's not really compensation because they're not paying her. I just see a lot of pens and a lot of angels dancing on a lot of pens and the bologna is getting sliced really fine. And that's my editorial comment. We don't want to slice bologna too finely here, but I don't think it's compensation. Even if it's coming through her paycheck, I don't think that actually matters because she's... That's ignoring the fact that she made a choice to undertake a cost even after being told that she wasn't going to be paid for it. All right, Ms. Harrell, thank you very much. Thank you, Your Honor. Mr. Wolfman, you're back with three minutes, I believe. Just one point, Your Honor. The first opposing counsel that spoke today for the first time injected the notion that it's not terms, conditions, or privileges that we're talking about. Perhaps there's not an allegation of discrimination sufficient to arise under Article III, and my response to that is that in Birthington Northern itself, among other cases, there, Justice Breyer says, discrimination is just differential treatment among protected persons. We certainly have alleged that here. I think we know that the discrimination itself, at least since the days of Brown v. Board, gets you over the Article III threshold and gets you over there quite clearly. Unless the Court has anything further, we'll rest on our briefs. All right, we appreciate it very much. Thank you both.